In the Matter of ROXANNA MAYTUM, Appellant, v PAUL D. NELSON et al., Constituting the Town Board of the Town of Chautauqua, et al., Respondents; PAUL STAGE et al., Intervenors-Respondents.

Fourth Department, July 12, 1976

*Walter M. Donovan* for appellant.

*Seymour Rollman* for respondents.

*DeNambro, Donovan & Laurita (Alan Laurita* of counsel), for intervenors.

MOULE, J. P. The question presented by this appeal is whether the Town Board of the Town of Chautauqua properly denied petitioner's application for a license to operate a junk-yard on unzoned property within the town.

Petitioner and her husband are the owners of four adjoining parcels of land at the junction of Route 17 and County Road 314 in the hamlet of Dewittville, a primarily residential settlement with a population of about 200 on the northwest side of Chautauqua Lake. Petitioner and her husband make their home on the property, which is located on a hillside overlooking the lake and for the past several years they have also operated an automobile repair service, a used car sales business and a junkyard there.

In 1967 the Town of Chautauqua enacted a local ordinance, known as Local Law No. 1-1967, which required the licensing of junkyards. The law provided, in substance, that junkyard operations were to be screened from public highways by a six-foot fence made of tight wood and that other perimeters were to be enclosed by a six-foot fence made of either tight wood or close wire mesh. Fences were to be equipped with a gate which could be secured during periods when supervisory personnel were not in attendance and cars were to be ar-ranged in neat rows leaving a 10-foot wide fire lane along the inside fence lines. Fire extinguishers were to be on hand and junkyard operators were required to maintain an office and suitable public sanitary facilities. In addition, the law required payment of a $25 licensing fee, mandated the renewal of license applications on a yearly basis, and provided for the revocation of licenses in the event a licensee failed to conduct his busi-ness in conformity with its regulatory provisions.

According to town records, on June 2, 1970 a letter was sent to 17 town residents, including petitioner's husband, advising them that the town had received "numerous complaints re-garding junk autos and junkyards in various locations" and suggesting that they obtain a copy of Local Law No. 1 from the Town Clerk's office. Petitioner denies having received such a letter and denies having been in the junk business at that time but, in any event, she admits having received a letter addressed to her husband dated May 17, 1974 which stated:

"Your Town Board has had numerous complaints regarding junk autos and junk yards in various locations in the Town of Chautauqua.

"You or your property has been mentioned in one or more of these complaints. We are not only trying to avoid complaints but also to improve the general appearance of the Town.

"We are again reminding you that there are State and Town laws regarding junk cars and junk yards and that these laws will be enforced."

Petitioner stated that she disregarded this letter because she was then the holder of a New York State dismantler's license and a State license to buy and sell used cars, and she believed that these two licenses were all that were required for the legal operation of her business. On August 9, 1974, however, she received another letter from the town, this one specifically informing her of the existence of Local Law No. 1 and advising that she ought to procure a license. On the very next day petitioner obtained a license application and submitted it for consideration by the board at its September 9, 1974 meeting.

Petitioner's husband appeared at the September 9 meeting in support of the license application. At that time the board also had before it a petition signed by 63 residents of Dewittville opposing the granting of the license on the grounds that the establishment of a junkyard would cause "depreciation of surrounding property and will be an 'eye-sore' in the community." Discussion centered around the fact that petitioner's property was not in compliance with the regulatory provisions of the licensing law and, additionally, around the problem that its hillside location would minimize the screening effect of any tight wood fence that might be constructed along the public highway. To alleviate this dilemma petitioner offered to terrace the hill with a bulldozer in order to allow for storage of cars at a lower elevation. The board, however, voted to disapprove petitioner's license application but in doing so it added a proviso granting petitioner 60 days within which to bring her property into compliance with the requirements of the law. One board member stated that if petitioner were able to comply with the law within 60 days she would be given a license.

Petitioner then took immediate steps toward compliance. She aligned her cars in orderly rows and installed fire extinguishers. She claimed to have expended in excess of $6,000 to construct a fence in accordance with the law's specifications, and also an additional $10,000 to begin construction of a new

building which was to house a dismantling and storage area along with office space and sanitary facilities. Since winter was approaching it was not possible to terrace the hill as had been planned but, as a temporary measure, petitioner constructed a dirt berm which served partially to conceal cars parked on the hill from view.

On November 11, 1974 petitioner appeared at another meeting of the town board and requested that her license be granted. The residents of Dewittville who opposed granting the license also were present. After the subject had been discussed the town board took the position that since petitioner's original license application had been denied and she had not filed a new application, she was at that time operating her junkyard in violation of the law. The next day she was informed by letter that she must cease her operations and "remove offending materials from your place of business."

There is some dispute in the record as to whether petitioner actually did cease her junkyard operation pursuant to this notice. She stated that no new junk cars were added to her inventory after the notice was received but people who lived nearby stated that they saw cars being brought in. Her response was that any brought in after November 12, 1974 were not junk cars but rather were there for either repair or resale. At any rate, it appears that while it may be true that no new cars were added to petitioner's junk inventory after November 12, none were removed from her property either.

On December 9, 1974 petitioner appeared at a meeting of the town board with a new license application in hand. At the same meeting a proposed local law was introduced which placed a six-month moratorium on the granting of junkyard licenses pending completion of work on a new town zoning ordinance. Action was deferred on petitioner's new license application pending an inspection of her property by town board members.

On December 21 her property was inspected. On December 28 the new junkyard license moratorium law was enacted, to become effective immediately, and on January 4, 1975 the town board voted to deny petitioner's license application. The reasons stated by the board for its action, as reflected in the minutes of the January 4 meeting, can be summarized as follows: (1) neither of petitioner's license applications was accompanied by a $25 fee; (2) petitioner did not cease her operations as directed on November 12 but instead brought in

more cars and allowed them to be parked outside the fence; (3) the fence was not equipped with a gate nor were public toilet facilities available.

By order to show cause dated February 8, 1975 petitioner commenced a proceeding pursuant to article 78 of the Civil Practice Law and Rules seeking a judgment directing the town board to issue to her a junkyard license. On February 21, 1975 the Dewittville residents who had opposed petitioner's license application from the outset were permitted to intervene.

A hearing was held in Supreme Court, Chautauqua County at which the foregoing factual background was developed. In response to the stated reasons for the board's denial of her license application petitioner testified that she was never told that the $25 fee provided for by the licensing law must accompany her application and denied that her inventory of junk cars had been expanded subsequent to November 12, 1974. She further stated that toilet facilities were available to the public in her house while the new building was being completed and that the fence was equipped with a gate but that on the day the town board members visited her property the gate was open and swung back against the inside of the wooden portion of the structure.

Town board members and several Dewittville residents also testified and from their testimony it appears that certain factors that were not reflected in the minutes of the January 4 meeting provided additional reasons for denying petitioner's application. Among these were the depressing effect that a junkyard operation would have on surrounding property values, the general aesthetic impact of a junkyard in an area devoted largely to recreational and resort activities, and specific instances in which, upon their inspection, board members noticed debris strewn outside the fence line along rear portions of petitioner's property. Junk auto and truck bodies could be seen atop petitioner's hill from the Chautauqua Institute, across the lake, and a beer truck body served to cover an uncompleted portion of the fence fronting the highway. In addition, testimony was presented to the effect that the continued existence of petitioner's junkyard threatened a planned $50 million expansion of a condominium project one-half mile away.

At the conclusion of the hearing the court upheld the board's action in denying petitioner's license. In doing so it

stated that there was no proof in the record that petitioner had either been guaranteed a license upon compliance with the requirements of the statute nor had she been misled into believing that she would be issued a license.

The power to grant a license carries with it, by natural implication, a discretion on the part of the licensing authority to refuse to grant one *(People ex rel. Schwab v Grant,* 126 NY 473; *Matter of Moore v Gallup,* 267 App Div 64, affd 293 NY 846). However, that discretion must be exercised in conformity with the express or clearly implied standard, policy or purpose of the licensing law *(Matter of Bologno v O'Connell,* 7 NY2d 155). The limits of reasonable discretion are transgressed where refusal to issue a license is based upon a ground which, under the applicable statute, the licensing authority may not consider or upon a ground which is not supported by any evidence *(Matter of Small v Moss,* 277 NY 501). One who seeks to compel the issuance of a license must show that he has a clear legal right *(Matter of Small v Moss, supra)* and courts will interfere with a determination to refuse a license only when, as a matter of law, no valid ground exists for its denial *(Matter of Barton Trucking Corp. v O'Connell,* 7 NY2d 299). In reviewing such matters only the grounds for denial invoked by the licensing authority may be considered and the court may not substitute reasons which it considers more adequate *(Matter of Barry v O'Connell,* 303 NY 46; *Matter of Golisano v Town Bd. of Town of Macedon,* 31 AD2d 85).

It is clear that the licensing law under scrutiny here has a twofold purpose. It is intended as a means of regulating the appearance of the countryside as well as for the promotion of public safety. In exercising its discretion with respect to petitioner's application, therefore, it was proper for the town board to consider not only whether there was compliance with the letter of the licensing law but whether, under all the facts and circumstances, including the hillside location of petitioner's property, the improvements which petitioner installed were adequate to satisfy the aesthetic aspect of the law as well (see *Matter of Suddell v Zoning Bd. of Appeals of Vil. of Larchmont,* 36 NY2d 312; cf *Matter of Bologno v O'Connell,* 7 NY2d 155, *supra).*

It is apparent that the topographical features of petitioner's land made the erection of a fence a virtual exercise in futility as far as screening petitioner's junkyard from public view was concerned. As a consequence, petitioner's offer to terrace the

hillside on which the junk cars were parked was of importance, and it appears that this pledge was weighed by town board members in initially agreeing to allow petitioner 60 days in which to bring her operation within acceptable standards. The terracing project, however, was not undertaken and when board members inspected the premises in December, they found that cars parked on top of the hill were still clearly visible. They also found that a portion of petitioner's fence had not been completed and that suitable public sanitary facilities had not been provided as required.

We think that these were adequate reasons for the board to deny petitioner a junkyard license and that in doing so the board did not transgress the permissible limits of its discretionary authority. Although the record contains several conflicting versions of key facts, this is certainly not a case where there is an absence of any evidence to support the board's determination *(Matter of Small v Moss, supra)*. In any event, petitioner has failed to show that she has a clear legal right to be issued a junkyard permit *(Matter of Small v Moss, supra)*. Since several of the board's reasons for denying petitioner a license were founded in her failure to have fully complied with the requirements of the licensing law within the time allotted, it is immaterial whether or not petitioner was either expressly or impliedly promised a license if she did comply. As a general rule, however, municipalities will not be estopped from carrying out their governmental power as to acts within their governmental capacities (see 21 NY Jur, Estoppel, § 78; *City of Yonkers v Rentways, Inc.,* 304 NY 499; *Town of Hempstead v Goldblatt,* 19 Misc 2d 176, affd 9 AD2d 941, affd 9 NY2d 101, affd 369 US 590) and there is no estoppel countenanced by the courts against public officials performing their legal duty *(Matter of Harwood v Cornelius,* 21 AD2d 961). Erroneous opinions of law offered by officials will not prevent the municipality from enforcing its laws properly *(Matter of Albert Simon, Inc. v Myerson,* 36 NY2d 300, app dsmd 423 US 908).

The judgment herein should be affirmed.

CARDAMONE, SIMONS, MAHONEY and DILLON, JJ., concur.

Judgment unanimously affirmed, without costs.